A. Jay Cristol, Judge, United States Bankruptcy Court
THIS CAUSE came before the Court for trial on January 22-30, February 1, 11, 22 and March 15, 2019 upon Count I of Plaintiff's Verified Amended Complaint. ECF No. 1-201.[2]
INTRODUCTION
This case has its genesis in a $ 56,000,000 loan (the "Senior Loan") made by *192 Regions Bank (and others) to Lexi Development Corp. ("Debtor") to fund construction of a multipurpose condominium. In normal financial times, the project would have been completed, the condominium units would have been sold, the bank(s) would have been repaid and Lexi would have retained the profits, if any. However, the date of the loan, December 5, 2005, was the edge of a cliff that the economy was about to fall over.
The Court takes judicial notice of the downturn in the economy, which was named by many as a recession (and by some as the "Great Recession"), and which continued from late 2005 through 2008, and for years thereafter. These years were the worst of times for condominium developers in Miami-Dade County. As a result of the collapsed market, the Lexi condos did not sell out and the initial loan could not be repaid when due on April 5, 2008.
NBV sued Regions[3] for breach of contract for failing to provide copies of five default letters to Lexi's junior lenders, the Greenwald Parents and Greenwald Parents' lender, GFB, as required under an Intercreditor Agreement ("ICA") and subsequent Letter Agreement. Plaintiff NBV claims that the banks' failure to send the notices of the Debtor's default on the loan, which was required under the ICA in this series of transactions, caused it damages.
As it was undisputed that Plaintiff, or rather its predecessor GFB, did not receive the required default notices, and Plaintiff entered trial with a partial summary judgment establishing the breach of the notice requirement under the ICA, and thus, liability for any damages caused by the breach. The Court reserved for trial the issue of damages that were caused by such breach. ECF No. 254.[4]
The Plaintiff was given the opportunity, in an eleven-day trial, to prove damages caused by the breach; however, not a scintilla of evidence proved that any damages to the Plaintiff were caused by its not receiving the default notice required by the ICA. At the inception of trial, NBV claimed damages of $ 14,629,325 for unpaid principal and interest on the entirety of the GFB-Lexi Loan (defined below), plus attorney's fees and costs. See 1/22/19 Tr. at 3:19-4:2. By the end of the trial, NBV was alternatively seeking:
(1) $ 3.35 million, representing the amount paid by Lexi to North Bay to settle North Bay's claim for default-rate interest on the Senior Loan [as defined below], plus pre-judgment interest;
(2) All attorney's fees, costs and other administrative expenses incurred by Lexi in defending North Bay's foreclosure and in the Lexi bankruptcy case; and
(3) All attorney's fees and costs incurred by NBV in pursuing its claims and interests in litigating against North Bay and Lexi.
ECF No. 558 at 23.
Without addressing Plaintiff's ability to recover Lexi's damages, the Court finds that, on the evidence presented at trial, NBV cannot recover at all against Regions on any damage theory because Regions' failure to provide copies of the default notices to GFB did not cause nonpayment *193 of the GFB-Lexi Loan or any other loss or damage that GFB claims. Instead, the evidence established that Regions acted in the best of good faith. It not only worked with the parties, modifying its loan agreement, extending the maturity date by a full year, and modifying release clauses to allow sales of some condominium units, but it also allowed the use of its cash collateral to pay operating expenses. Additionally, after several negotiations to try to work out the financing problems, it sold the loan to an entity that offered an additional extension of the loan for three years at contract rate interest - which offer was rejected.
The evidence presented proves that Regions acted in good faith in an effort to work out the financial distress caused by the economic downturn. The Court finds the evidence failed to prove that NBV suffered any damage by not receiving the default notices. Although the Plaintiff asserts that the testimony of both Scott Greenwald and Mehdi Ghomeshi establishes that GFB would have cured the default and avoided additional expenses if it had received notice of Debtor's default, the Court finds the testimony of those witnesses to lack credibility and sincerity. In fact, the Court finds that GFB, and Mehdi Ghomeshi, were well aware of Lexi's default on the Senior Loan and the ongoing negotiations between Scott Greenwald, on behalf of the Debtor, and Regions Bank; and notwithstanding the knowledge of the default and the negotiations, GFB chose to forego exercising its options to purchase the loan or to cure Lexi's default thereunder.
Plaintiff's arguments-that GFB did not contact Regions to provide a cure once it learned of the default because the ICA did not give GFB the right to do so and it did not want to subject itself to lender liability-are similarly insincere and wholly without merit. The evidence proves that GFB always had the right to purchase the Senior Loan at par.[5] But whether GFB believed Scott would work things out with Regions or whether the economic climate of the time prevented the purchase of the Senior Loan, GFB never chose to purchase the Senior Loan. GFB repeatedly rejected opportunities to purchase the Senior Loan as requested by Scott, or finance Allen's purchase of the Senior Loan, or finance Lexi's restructure with North Bay, or exercise GFB's option to purchase the Senior Loan in September 2009 when North Bay offered to sell at par (i.e. contract-rate interest) or exercise its option to purchase the Senior Loan in June 2010 when GFB learned of Lexi's bankruptcy. Moreover, GFB never sought to mitigate any potential loss by seeking to collect from the Greenwalds, the obligors and guarantors.
FINDINGS OF FACT
The evidence presented was tedious and the testimony of the ten witnesses over an extended period was redundant; but generally, the Court found the witnesses to be candid, forthcoming and credible, with the exception of Scott Greenwald and Mehdi Ghomeshi, who were simply not credible or persuasive on certain critical issues. Based upon the evidence presented and the Court's assessment of each witness' credibility, the Court finds as follows:
*194 A. The Parties
1. NBV is a Delaware limited liability company whose sole member is NBV Loan Acquisition Member, LLC ("NBV Member"), a Florida limited liability company, whose sole member has been Allen since inception.
2. Lexi is the Debtor-in-Possession and a Florida corporation, owned and controlled by Allen and Scott, which developed a mixed use residential and retail condominium, The Lexi, in North Bay Village. ECF No. 15-3 at 38.
3. Regions is an Alabama bank and was the administrative agent and co-lender of the Senior Loan.
B. The Loans to Lexi and the ICA
4. On December 5, 2005, Regions and its co-lenders made an approximately $ 56 million loan to Lexi to develop The Lexi ("Senior Loan"), secured by a first mortgage. NBV Ex. C-G; RB Ex. 6.
5. On the same date, Greenwald Parents made a $ 6 million mezzanine loan to Lexi ("Junior Loan"), secured by Lexi stock and guaranteed by Scott and Amy under their unlimited, continuing and unconditional guaranty ("Unlimited Guaranty"). NBV Ex. L, N, O; RB Ex. 9.
6. To fund the Junior Loan, Greenwald Parents borrowed $ 6 million from GFB ("GFB-Lexi Loan"), secured by a collateral assignment of Greenwald Parents' shares in Lexi and the Junior Loan documents, including the Unlimited Guaranty. NBV Ex. H-K; Tr. 1/23/19 at 80:4-13 (Former GFB CEO Mehdi Ghomeshi ("Ghomeshi")).
7. The GFB-Lexi Loan was and remains a personal obligation of the Greenwalds-Greenwald Parents as note makers and Scott and Amy as unlimited guarantors of the Junior Loan collaterally assigned to GFB. GFB never held a lien on any of Lexi's assets, including its real estate. The Greenwalds were obligated to repay the GFB-Lexi Loan whether or not Lexi ever sold a single unit. Tr. 2/11/19 at 41:19-25 (Former GFB workout specialist Marcus Buerosse ("Buerosse")).
8. In connection with the Senior and Junior Loans, Regions and Greenwald Parents entered into the ICA. NBV Ex. A. GFB was not a party. In pertinent part, paragraph 12 provides:
[Regions] will provide to [Greenwald Parents] a copy of any written notice of default under the [Senior] Loan documents provided by [Regions] to [Lexi] concurrently with the providing of such written notice to [Lexi] and, in any event, prior to accelerating the [Senior] Loan and prior to [Greenwald Parents] (but not [Lexi] ) being obligated to pay default rate interest to [Regions] in order to cure the applicable default.
Id. at ¶ 12. Thus, Regions was obligated to send a copy of a written notice of Lexi's default concurrently to Greenwald Parents and, in any event, before accelerating the Senior Loan. Greenwald Parents then had the option to cure the default or buy the Senior Loan at par, calculated by "the outstanding amount of the Loan and all sums secured by the Senior Security Documents which would be due and payable if the Senior Debt was paid at the date of such acquisition." Id. Greenwald Parents also had the right to purchase the Senior Loan at par "[i]n the event [Greenwald Parents] receive[d] notice of ... (b) a Bankruptcy Proceeding with respect to" Lexi. Id. Regions had the right to sell the Senior Loan without notice to or the consent of Greenwald Parents. Id. at ¶ 22.
C. The Real Estate Market Crash
9. In December 2005, when the Senior and GFB-Lexi Loans were originally made, Lexi had made enough pre-construction *195 sales to satisfy both. RB Ex. 65; 2/1/19 Trial Tr. at 4:17-5:4 (Ghomeshi). However, beginning in 2007, if not before, South Florida began to suffer a steep decline in real estate values, see, e.g., Tr. 1/29/19 at 114:6-9, and Lexi was having difficulty making sales. Tr. 2/11/19 at 37:8-15 (Buerosse). According to Ghomeshi, when 2008 began, GFB was "already beginning to feel the effects of what came to be known as the great recession," which caused real estate values to plummet. Tr. 1/23/19 at 60:23-61:12 (Ghomeshi). Indeed, as of June 2008, Lexi had only been able to close on 84 sales contracts of its 164 units, RB Ex. 65; Tr. 2/1/19 at 3:17-5:4 (Ghomeshi), and Regions was holding more than $ 1 million in forfeited deposits from defaulting Lexi purchasers. RB Ex. 15 at 4.
10. The plummeting values of Lexi's units is documented in two appraisals obtained by Regions. The first, the CBRE appraisal dated as of February 17, 2008, valued The Lexi at over $ 36 million, using retail sales from 2005-07 as comparable sales. RB Ex. 62 at 3. The second, the Waronker and Rosen appraisal dated as of November 19, 2008, valued The Lexi at $ 15.1 million, using discounted bulk sales to investors in place of the then non-existent retail market. RB Ex. 63 at 6. These appraisals indicated a nine-month decrease in value of almost 64%.
11. During this "Great Recession", Regions and Lexi attempted to restructure the Senior Loan. With the April 5, 2008 maturity of the Senior Loan approaching, Regions was willing to agree to a one-year maturity extension-through April 5, 2009-provided Lexi agreed, inter alia , to reduce the principal balance it owed to $ 15,750,000 by October 2008 and to deposit $ 2 million into a collateral account ("Collateral Account") to cover interest, taxes and other carrying costs. RB Ex. 96.
12. GFB also needed to ensure that its position (unsecured by Lexi's real estate) was protected. One of the options it considered was a takeout loan to Lexi to satisfy the Senior Loan, to be secured by a first mortgage on Lexi's real estate. GFB prepared a draft commitment letter for a loan to Lexi of "up to $ 23,432,500 not to exceed 65% [loan-to-value] of" Lexi's real estate, RB Ex. 93, 94; Tr. 1/23/19 at 119:18-8 (Ghomeshi), but no such loan was ever made
13. During this period, the FDIC downgraded a number of the Greenwald loans, including the GFB-Lexi Loan, to CSS-6 "special mention," just above substandard. RB Ex. 98.
14. On March 31, 2008, Ghomeshi and the Greenwalds' account officer, Donny Duarte ("Duarte"), met with Allen to discuss their "global relationship," and GFB advised the FDIC that Allen was having "cash flow issues." GFB was "closely monitoring" the GFB-Lexi Loan. RB Ex. 98 at 4.
D. 2008 Senior Loan Maturity and Modification
15. Lexi failed to pay the approximate $ 20 million balance of the Senior Loan at maturity on April 5, 2008. GFB was advised of the ongoing restructure negotiations with Regions, as Ghomeshi met regularly with Allen to discuss the GFB-Lexi Loan and other classified Greenwald loans. RB Ex. 102.
16. At an April 8, 2008 meeting, Allen informed GFB of Lexi's "sales fallout due to the current residential real estate market," and restructure discussions with Regions. Id. In an April 15, 2008 report, Duarte noted that GFB was "closely monitoring" the credit facility given the sudden change in Allen's "cash flow situation." Id.
*196 17. On April 18, 2008, GFB downgraded the GFB-Lexi Loan to CSS-6 (special mention), consistent with the FDIC's downgrade "[g]iven how the current residential real estate market has affected the [Lexi] project" as well as the strain on Allen's cash flow. RB Ex. 64 at 3.
18. On May 6, 2008, GFB further downgraded the Greenwald loans to CSS-7, a substandard designation,[6] RB Ex. 65, due to Greenwald Group's worsening cash flow problems, caused by a "dramatic" real estate market change and Allen's "overall financial condition being severely impacted by several of his real estate projects." RB Ex. 109 at 5; RB Ex. 65 at 4. GFB understood the declining real estate market adversely affected Lexi's ability to sell units, which in turn could affect Greenwald Parents' ability to repay the GFB-Lexi Loan. Tr. 1/23/19 at 111:5-9 (Ghomeshi: "[G]iven the market conditions, Lexi was having a hard time making retail sales of condominium units to purchasers who might live there in June of 2008.").
19. As part of its "close monitoring," GFB frequently met with Allen and Scott. At a May 15, 2008 meeting, Allen advised Ghomeshi and Duarte that Lexi was planning to close the Senior Loan restructure on May 16, but Lexi "did not have the equity needed for closing" and needed financing to remove a contractor's lien on The Lexi. RB Ex. 102 at 2.
20. On June 4, 2008, GFB and Allen discussed a "possible resolution" on the Greenwald loans, including the GFB-Lexi Loan:
There were several proposals laid out which [GFB] is currently evaluating. Moreover, [Duarte] will meet at the Borrowers office [sic ] on June 5, 2008 to obtain updated financials and a global cash flow. It should be noted that [GFB] and Borrower will continue to have ongoing conversations. As such, [GFB] will continue to closely monitor this facility and recommend a grade change when deemed appropriate.
RB Ex. 103.
21. On June 12, 2008, at Duarte's request, Regions sent an estoppel letter to GFB confirming the then-current principal balance of the Senior Loan at $ 19,292,602.46. RB Ex. 107.
22. In an internal memorandum dated June 13, 2008, GFB noted the Senior Loan had matured April 5, 2008, but Regions had agreed to extend maturity to April 5, 2009 if Lexi deposited $ 2 million in the Collateral Account. GFB also noted that $ 20 million in principal was outstanding. RB Ex. 109 at 4; 6-7. However, because Allen and Lexi did not have the full $ 2 million, GFB agreed to advance funds under the GFB-Lexi Loan for Greenwald Parents' advance to Lexi. Id. at 7-8. The memorandum noted the Greenwald loans "will remain a CSS-7 rating and will continue to be closely monitored by Risk Management." Id. at 10.
23. On June 23, 2008, Regions and Lexi executed a Modification Agreement effective as of April 5, 2008 ("Modification"), extending the Senior Loan maturity to April 5, 2009 and requiring the principal reduction to $ 15,750,000 ("Curtailment Payment") by October 5, 2008 and $ 2 million for the Collateral Account. NBV Ex. P-T.
24. Regions permitted Lexi to fund the $ 2 million with $ 1 million in forfeited customer deposits, agreeing to release its *197 lien to that extent. NBV Ex. P at 4. Lexi funded the balance from an advance under the Junior Loan, which Greenwald Parents in turn borrowed under the GFB-Lexi Loan. NBV Ex. U-X. Of the $ 2 million advanced by GFB, $ 800,000 was deposited into a GFB reserve account for interest under the GFB-Lexi Loan. RB Ex. 109 at 7; Tr. 1/23/19 at 132:5-21 (Ghomeshi). The Junior Loan and GFB-Lexi Loan notes were each modified to reflect an $ 8 million principal balance (NBV Ex. V, Y), and Scott and Amy ratified their Unlimited Guaranty of the Junior Loan (RB Ex. 9) for its higher amount and the collateral assignment to GFB. RB Ex. 22.
25. Regions and Greenwald Parents also entered into a Letter Agreement, to which GFB agreed as to paragraph 3, which provides in pertinent part:
We [Regions] agree that in the event we give notice to [Greenwald Parents] of a default under the loan pursuant to paragraph 17 of the Intercreditor Agreement, a copy of such notice shall be sent to [GFB].
[GFB] shall have the same rights as [Greenwald Parents] under paragraph 12 of the Intercreditor Agreement to cure defaults under the loan and to purchase the loan, provided that in the event both [Greenwald Parents] and [GFB] each exercise the option to purchase the loan under said paragraph 12, the party first exercising such option right shall be entitled to purchase the loan under said paragraph 12.
NBV Ex. B at ¶ 3.
26. According to Ghomeshi, GFB wanted the ICA option rights "to prevent Regions Bank from accelerating or foreclosing" and "if Regions does not declare a default and accelerate, I do not think they needed to give Great Florida Bank any notice." Tr. 2/1/19 at 61:12-21.
27. With the Modification in place, GFB knew the following: At the April 5, 2009 maturity, Lexi would have to pay the balance owing; the only principal payment required before maturity was the Curtailment Payment, which would trigger a default before maturity if not made; and "the only thing that could happen between the [Modification] and maturity that [GFB] had to monitor to see to it there was no interim default and acceleration before maturity" was Lexi's ability to make the Curtailment Payment. Tr. 1/23/19 at 167:2-21 (Ghomeshi); see also Tr. 2/1/19 at 12:24-13:8 (Ghomeshi).
28. Scott agreed to the Curtailment Payment because he believed GFB would stand behind the Senior Loan and step in and make the payment if Lexi were unable to do so. Tr. 1/25/19 at 55:4-56:12 (Scott).
E. Post-Modification, GFB Continued "Closely Monitoring" Senior Loan
29. Following the Modification, GFB continued to "closely monitor" Lexi's performance under the Senior Loan. See, e.g. , Tr. 2/1/19 at 33:1-17 (Ghomeshi: GFB was "closely monitoring Lexi's performance of its obligations to Regions Bank under the Senior Loan, because if [Lexi] defaults on that obligation, the GFB-Lexi Loan would itself be cross-defaulted."); Tr. 1/23/19 at 166:14-18 (Ghomeshi: "[I]n order to closely monitor [the GFB-Lexi Loan], [GFB] would have to know if Lexi was in a position to meet its obligations to Regions Bank under the Senior Loan.").
30. From the time GFB made the $ 2 million advance, it knew Lexi's ability to make the Curtailment Payment by October 5, 2008 was precarious. As Ghomeshi testified, GFB's June 30, 2008 Criticized Asset Report ("CAR"), dated just seven days after the Modification, noted the real estate decline had severely affected Lexi's *198 sales and it was marketing bulk sales to investors at reduced prices, which adversely affected Lexi's ability to pay Regions and GFB. RB Ex. 65; Tr. 2/1/19 at 4:17-5:4. (Ghomeshi: CAR reflected the Great Recession of 2008, with preconstruction sales contracts falling through and Lexi having trouble).
31. In an August 2, 2008 email, Ghomeshi directed Duarte to "get monthly status report[s]" because GFB "can't afford to be at the same place a year from now." Duarte responded presciently, "[i]t is not a year from now when we need to worry. It is October when Scott is required to make a $ 5MM principal reduction," referring to the Curtailment Payment. RB Ex. 115.
32. GFB was closely monitoring whether Lexi could meet its obligations under the Senior Loan, including making the Curtailment Payment. Tr. 1/23/19 at 166:14-167:21 (Ghomeshi). Ghomeshi arranged a meeting with Allen and Scott for August 14, 2008. RB Ex. 116. On August 12, 2008, Ghomeshi asked Scott whether Lexi was required to "pay down Regions by $ 5MM in October", referring to the Curtailment Payment due October 5, 2008. RB Ex. 118; Tr. 2/1/19 at 14:8-15:24 (Ghomeshi).
33. Although he didn't recall telling Ghomeshi specifically, Scott testified that, if Ghomeshi had asked about the paydown, Scott "would have told him." Scott never withheld or concealed any information from Ghomeshi concerning Lexi's ability to repay the Junior Loan or GFB-Lexi Loan. Tr. 1/25/19 at 60:14-61:17 (Scott). Scott advised GFB that he was hoping to close sales on additional units, RB Ex. 276, which Ghomeshi understood meant Scott was "hopeful that Lexi would be able to sell enough units between August 13, 2008 and October 5, 2008, in order to [make the Curtailment Payment]." Tr. 2/1/19 at 17:18-24 (Ghomeshi).
34. By this point, the real estate decline had turned into a collapse. Ghomeshi testified that in August/September 2008, the Great Recession was "really taking hold." Tr. 2/1/19 at 17:25-18:3.
35. GFB's commercial loan assets continued to deteriorate. In September 2008, GFB hired Buerosse to manage and restructure GFB's classified loans, including the Greenwald loans. Tr. 1/23/19 at 95:4-96:3 (Ghomeshi). Buerosse reported directly to Ghomeshi; he worked with him on a "daily basis," and also "closely monitored" Lexi's performance under the Senior Loan. Tr. 2/11/19 at 12:18-13:2; 37:24-38:3 (Buerosse).
36. On September 15, 2008, the Florida Office of Financial Regulation ("OFR") examined GFB, noting the extreme effects of the Great Recession, including an increase in adversely classified items from 62% of Tier 1 Capital as of June 2007 to 140% as of June 30, 2008. RB Ex. 387. In a February 16, 2009 Memorandum of Understanding ("MOU"), the OFR noted that the September 15, 2008 examination report "reflected unsatisfactory conditions that, if not corrected, could deteriorate into a more severe situation." RB Ex. 162 at 2. Among other corrective actions, GFB agreed to reduce its classified commercial real estate related loans. RB Ex. 162 at 2-3 ¶ 3. GFB agreed to reduce the amount of classified assets to no more than 130% of Tier 1 Capital within 8 months, 110% within one year, 90% within 18 months, and 60% within 24 months, id. at 3 ¶ 5, and to "make every effort to reduce its concentration in commercial real estate lending." Id. at 4 ¶ 10. Ghomeshi and his fellow directors signed the MOU. Id. at 6; Tr. 2/1/19 at 22:25-23:5 (Ghomeshi).
37. Although reluctant to attribute their corrective measures to this regulatory mandate, both Ghomeshi and Buerosse *199 implemented this very "reduction" strategy as sound practice in mitigating GFB's exposure to commercial loan losses. Tr. 2/1/19 at 31:11-32:2 (Ghomeshi). Buerosse's primary strategy was to procure pledges of additional collateral to offset GFB's loan loss reserves. Tr. 2/11/19 at 93:5-22 (Buerosse). This strategy would guide him in mitigating the potential GFB-Lexi Loan loss. Id. ; 72:16-20. As Buerosse testified, a further protective advance to cure Lexi's default, or a purchase of the troubled Senior Loan, was not part of this strategy as that would increase, not reduce, GFB's classified asset exposure. Id. at 72:21-75:16.
38. In September and October 2008, Scott informed GFB that Lexi was trying to make bulk sales for the Curtailment Payment "to prevent acceleration, default interest and foreclosure." RB Ex. 66; Tr. 1/28/19 at 7:10-18 (Scott). In early October 2008, Scott informed Ghomeshi that Lexi was "working with Regions Bank to try to make bulk sales to raise the money for the curtailment payment to prevent acceleration, default interest and foreclosure." These bulk sales were the source of Scott's "hope" that Lexi could timely make the Curtailment Payment. RB Ex. 276. GFB reported these efforts and its "close monitoring" of Lexi's performance to FDIC in a CAR dated September 30, 2008. RB Ex. 66.
F. The Senior Loan Workout and the Five Default Letters
39. On October 3, 2008, Regions sent a letter to Lexi ("October 3 Letter"), with copies to Greenwald Parents and Amy, but not GFB. RB Ex. 120. At the time, the Senior Loan was not yet in default. The letter extended the Curtailment Payment deadline to October 16, 2008. Although receiving this letter, Greenwald Parents did not exercise their cure/purchase option under the ICA.[7] Scott could not recall if he forwarded the October 3 Letter to GFB but testified "I know I told Mehdi Ghomeshi I was working with Regions Bank on meeting the paydown requirement" through unit sales and was "working things out with Regions." Tr. 1/25/19 at 62:6-63:20.
40. From Buerosse's testimony, the Court understands that even if Regions had sent the October 3 Letter to GFB, GFB would not have cured the default or purchased the Senior Loan. Buerosse did not even consider the October 3 Letter a notice of default, Tr. 2/11/19 at 46:8-47:2, and testified that so long as no "enforcement action was started ... acceleration really doesn't apply." Id. at 45:1-11. GFB considered acceleration as the critical event. Ghomeshi testified that despite Regions' letters mentioning Lexi's default, he "couldn't and did not need to worry about it, until such time Regions decides the loan is in default and accelerates [,]" Tr. 2/1/19 at 40:19-23, and "if Regions does not declare a default and accelerate ," Regions was not required to "give [GFB] any notice." Tr. 2/1/19 at 61:16-21. As discussed herein, Regions never accelerated, and foreclosure did not occur until two months after Lexi defaulted on the April 5, 2009 extended maturity date, which was extended by Regions from the original maturity date of April 5, 2008.
41. On October 15, 2008, one day before the Curtailment Payment was due, Scott and Allen met with Ghomeshi and Duarte. RB Ex. 124. Lexi did not have the necessary funds, Tr. 1/25/19 at 65:8-14 *200 (Scott), a fact known to Ghomeshi. Tr. 1/28/19 at 5:11-22 (Scott: Ghomeshi "knew of the situation."). GFB did not contact Regions about a cure or purchase, and neither the ICA nor Letter Agreement prohibited such contact. The Court believes GFB did not do so because Scott told GFB that Lexi was in workout discussions with Regions, which would prevent acceleration and foreclosure. Tr. 1/28/19 at 5:11-22; 9:8-20 (Scott). Scott informed Ghomeshi that Lexi was working things out with Regions and there was no need to exercise GFB's rights under the ICA. Tr. 1/28/19 at 9:8-20 (during this time, Scott updated GFB "as to what [he] was doing [with Regions] so there would be no need for [GFB] to have to cure the -- the paydown.").
42. According to Ghomeshi, even without a notice letter from Regions, Tr. 2/1/19 at 83:9-84:8, GFB could have financed the Curtailment Payment and acquired a carved-out first mortgage lien on the units roughly equal to the Curtailment Payment amount. Tr. 1/23/19 at 27:25-28:20 (Ghomeshi). GFB took no such action though.
43. As Scott reported to GFB, Regions and Lexi continued workout discussions. During this time, Regions applied the contract-rate monthly interest payments from the Collateral Account. Tr. 1/22/19 at 140:9-141:9 (Regions officer James Miropol ("Miropol"): as of the sale to North Bay, Senior Loan was not accelerated and Regions was charging contract-rate interest on monthly basis); Tr. 2/22/19 at 17:24-18:4 (North Bay CEO Casey Cummings ("Cummings"): as of North Bay's purchase of the Senior Loan, maturity date had not been accelerated); NBV Ex. NN at 24 (Sale and Assignment Agreement ("SAA") with North Bay indicating outstanding contract-rate interest of $ 100,945.74).
44. On October 17, 2008, the day after Lexi missed the extended Curtailment Payment deadline, Regions sent the second letter to Lexi ("October 17 Letter") agreeing to release the mortgage lien on certain units and reserving rights/remedies for Lexi's default, to which Lexi agreed. RB Ex. 125.
45. NBV contends that the October 17 Letter evidences an acceleration because it provides that "the Loan [is] "currently due and payable in full ...." However, no acceleration occurred. Lexi understood there was no acceleration. Tr. 1/25/19 at 45:10-14 (Scott admitted Regions "didn't demand full payment immediately from Lexi."). GFB also understood there was no acceleration. According to Ghomeshi, "Regions Bank, like many other banks at the time, would send default letters that may or may not decide to accelerate" to be "used as a negotiating tool." Tr. 2/1/19 at 64:16-65:18. Ghomeshi was not surprised that Regions would send a letter saying the Senior Loan was in default, but then attempt to work with Lexi. Id. at 66:17-67:2. Buerosse agreed that the October 17 Letter was a "reservation of rights" letter, similar to many he had sent in workouts while accepting payments, Tr. 2/11/19 at 49:24-51:13, and Regions' actions were "inconsistent" with acceleration. Id. at 55:19-24.
46. Scott continued workout discussions with Regions. See Tr. 1/25/19 at 71:8-21.
47. On October 30, 2008, knowing of Lexi's default status and forbearance discussions, Greenwald Parents consented to Regions' releasing its lien on 11 units for a bulk-sale contract of $ 2,916,530. RB Ex. 129; Tr. 1/25/19 at 107:4-108:6 (Scott).
48. On November 3, 2008, Regions sent the third letter ("Forbearance Agreement"), counter-signed by Lexi, Scott and Amy, again extending the Curtailment Payment deadline to December 4, 2008 so *201 Lexi could complete the bulk sale. Both GFB and Allen knew of the forbearance. Tr. 1/25/19 at 107:4-108:6; 105:13-22 (Scott: Allen knew of proposed bulk sale); 62:24-26 (Scott: "I communicated with Ghomeshi that [Lexi] was trying to sell units to make the paydown requirement"). The Forbearance Agreement reserved Regions' right to declare the Senior Loan immediately due and payable, confirming no acceleration had occurred. RB Ex. 131 at 1-2.
49. As Scott testified, because Lexi was attempting to cure the default, Regions permitted Lexi to use cash collateral to pay operational expenses. Tr. 1/25/19 at 71:8-72:23.
50. On November 13, 2008, Regions sent the fourth letter ("November 13 Letter"), noting termination of the forbearance because of the failed bulk sale. RB Ex. 136. Regions did not exercise any right or remedy, but rather reiterated its willingness to continue to work with Lexi:
On a final note, there was an interest payment due under the Loan on November 5, 2008, in the amount of $ 103,847.56, which the Bank, pursuant to its rights under the Modification Agreement, made from the "Interest Reserve". This payment does not change the default status of the Loan, does not constitute a waiver of any rights or remedies of the Bank arising from this default status, all such rights being specifically reserved, nor does it obligate the Bank to further disburse funds from the Interest Reserve.
RB Ex. 136 at 2. Buerosse acknowledged this was "inconsistent with accelerating the maturity date of the loan." Tr. 2/11/19 at 55:4-24.[8]
51. On November 18, 2008, Duarte emailed Buerosse and Ghomeshi confirming a meeting with Allen and his financial advisor for November 20, 2008 and noting Allen's "very concerning" tone. RB Ex. 139. Ghomeshi did not recall the meeting but was not surprised that Allen's tone would have been "very concerning" because Ghomeshi "was concerned [him]self about everything that was happening in our economy." Tr. 2/1/19 at 68:2-17.
52. At the November 20 meeting, Allen and Scott advised that "[Lexi] is in financial distress and requires additional funds to complete projects in order to sell [condominium] units....." and "Regions was attempting to sell the note." RB Ex. 67; Tr. 1/25/19 at 117:20-118:1 (Scott); Tr. 2/11/19 at 78:4-9 (Buerosse).
53. Although GFB was aware of Lexi's default since mid-October 2008, and of its "financial distress" and the potential sale of the Senior Loan, GFB chose not to cure or purchase the Senior Loan (at par or otherwise). Instead, GFB decided to obtain additional collateral for the GFB-Lexi Loan because GFB did not want to commit additional capital to the Greenwalds and was attempting to reduce its classified assets, not increase them.
54. On December 1, 2008, Scott emailed Buerosse and Ghomeshi for another meeting that day. RB Ex. 143. GFB regularly met with the Greenwalds during this period. Tr. 2/1/19 at 77:9-12 (Ghomeshi: Buerosse and Duarte had "frequent meetings with the Greenwalds" and Ghomeshi "sometimes" attended); Tr. 2/11/19 at 38:4-23 (Buerosse: GFB's close monitoring included regular meetings with Allen and Scott).
*202 55. The following day, Greenwald Parents acknowledged their consent, as Junior Lenders, to Regions' acceptance of a reduced release price for a unit, which did not affect "the default status of the [Senior] Loan". RB Ex. 144; Tr. 1/30/19 at 65:14-67:21 (Allen). Although they knew of Lexi's default status, Greenwald Parents did not exercise their option to cure or purchase the Senior Loan.
56. The very next day, December 3, 2008, Allen again met with Buerosse. RB Ex. 145.
57. On December 9, 2008, Regions sent the fifth letter ("December 9 Letter"), noting an additional default for Lexi's conveyance of a unit without paying the release price to Regions. RB Ex. 146. The December 9 Letter did not evidence an acceleration or increased interest rate; to the contrary, Regions debited the Collateral Account for contract interest and reserved its rights and remedies. Id. ; Tr. 1/25/19 at 112:3-9 (Scott). Allen met with Ghomeshi and Buerosse later that same day. RB Ex. 147.
G. GFB Declined Scott's Request to Buy or Finance Purchase of Senior Loan
58. As Regions-Lexi workout discussions continued, Buerosse began to implement his primary workout strategy ("Buerosse Plan") by requesting Allen to pledge his limited partnership interest in the El Mercado shopping center for the undersecured GFB-Lexi Loan. Scott objected, imploring GFB to purchase the Senior Loan instead:
Marcus,
According to Stephen Bittel of Terranova's latest estimate, El Mercado has a value of $ 20 million, making Allen's share around $ 2 million. I do not see how that is better collateral than a first mortgage on The Lexi which your loan to Allen is only secured by a mezz behind this first! You are spiting yourself in this whole process, not to help us and to hurt the bank more! If you or Mehdi decide to do something that will benefit both us and GFB, let's talk.
Scott
RB Ex. 150. Buerosse promptly emailed Ghomeshi with "high importance" to discuss Scott's request and for an update. Id.
59. Contrary to NBV's contentions, GFB never intended to exercise its cure/purchase rights under the ICA. Ghomeshi admitted that even without a formal default notice from Regions, GFB could have made a takeout loan to Lexi to satisfy the Senior Loan if GFB thought it was a good idea. Tr. 1/23/19 at 149:19-150:15 (Ghomeshi); 2/1/19 Tr. at 83:19-84:8 (Ghomeshi). As Ghomeshi said:
Q. Great Florida Bank did not, at any time, take a first position behind -- on the Regions' senior loan, even though Scott Greenwald of Lexi asked you to do it, correct?
A. Yes.
...
Q. You did not require a notice letter from Regions under the inter-creditor agreement in order to decide to make a loan to Lexi Development Company, Inc. to refinance the senior loan, did you?
THE WITNESS: You're correct.
Q. I'm correct?
A. Yes, you are correct.
Id. at 82:13-17; 83:19-22; 84:3, 7-8.
60. As Buerosse recalled, GFB was "relying on [Scott] to sell units to, you know, address the -- the Regions situation, and, you know, in that context, we want some additional collateral to, you know, improve our collateral position." Tr. 2/11/19 at 71:19-72:15. Buerosse had "many conversations where I was trying to get *203 the El Mercado pledge as additional collateral, and the fact that Scott and Allen did not want to do it and were very recalcitrant in terms of providing that piece of collateral, but ultimately, [I] kept pushing for that piece of collateral." Id. at 63:23-64:8. Obtaining additional collateral was the "major component" of GFB's strategy for resolving the GFB-Lexi Loan and a takeout loan to replace Regions as senior lender "was not a primary strategy." Id. at 72:10-23 (Buerosse).
61. On January 19, 2009, Scott again reiterated that GFB should buy the Senior Loan:
Mehdi, Attached is the remaining inventory at The Lexi as well as the updated Oaklane projections. We should discuss a deal in which GFB will get paid off 100% on ALL of its loans to both Allen and Scott Greenwald. By not acting like a bank but acting like what Obama wants banks to be, GFB will be the one who comes out of this situation, getting paid off on all its loans with interest, not losing millions like the other banks. Thanks, Scott
RB Ex. 152.
62. Scott also sent a spreadsheet he prepared, titled "Lexi Available Units-Loan Purchase-gfb.exs", which listed the current Senior Loan balance of $ 17,287.339 and proposed "BID FOR REGIONS LOAN" of $ 10 million. RB Ex. 152 at 2; Tr. 1/25/19 at 93:4-23 (Scott). Scott heard the Senior Loan was sold and assumed a substantial discount, "let's say, for $ 8 million," and proposed a $ 10 million bid to GFB. Tr. 1/25/19 95:3-06:2 (Scott); Tr. 2/1/19 at 87:9-11 (Ghomeshi: Scott proposed that GFB may be able to buy Senior Loan at discount). Lexi and Greenwald Parents never offered more than $ 10 million for the Senior Loan. Tr. 1/24/19 at 57:18-24 (Hugo Pacanins ("Pacanins") of RAM, North Bay's affiliate: Greenwalds never offered to buy Senior Loan from North Bay at par; offered only in the range of $ 10 million); 59:8-10 (Pacanins: Greenwalds never offered more than $ 10 million); Tr. 2/1/19 at 89:2-9 (Ghomeshi did not recall ever attempting to purchase Senior Loan for a discount and never made an offer to Regions to purchase at par).
63. Buerosse claimed that he and Ghomeshi did not contact Regions to cure Lexi's default because of concern about interfering with Lexi-Regions workout discussions and a lender liability claim. Tr. 3/15/19 at 26:6-18. However, Ghomeshi knew of no legal impediment preventing GFB from making a loan directly to Lexi, Tr. 1/23/19 at 150:8-15, and GFB had previously contacted Regions for estoppel information concerning GFB's own modification. See supra at ¶ 22. The Court is not persuaded by Buerosse's testimony that GFB declined to contact Regions about a cure on account of "interference" or "lender liability" concerns. Indeed, if GFB had any concern, all it had to do was ask Scott's permission. GFB never did so. Buerosse admitted there was no need to contact Regions in light of the Regions-Lexi workout discussions:
Q. Did you ask Scott Greenwald permission to contact Regions Bank so that you and Great Florida Bank could protect your position from erosion?
[Buerosse]: To my recollection, no.
Q. And why did you not ask Scott Greenwald for that permission?
*204 A. Based on my recollection is, they were in negotiations which, based upon what Scott was telling me, seemed to be moving in a direction where they could resolve the status of the loan with Regions.
Q. So did it satisfy you at Great Florida Bank that Scott Greenwald seemed to be in a position to work things out with Regions, so that Great Florida Bank's junior position would not be eroded?
A. That was the expectation.
Id. at 44:20-45:14.[9]
64. Effective January 23, 2009, Regions sold the Senior Loan to North Bay, which assumed Regions' rights and obligations, including under the ICA and Letter Agreement. NBV Ex. NN at 2 ("Buyer shall expressly assume all of Seller's duties, obligations and responsibilities with respect to the Assigned Rights"); id. at 26-27 (listing assumed loan documents including ICA and Letter Agreement). The SAA indicated that contract-rate interest "was paid through December 5, 2008" confirming Regions had not accelerated the Senior Loan. Id. at 24; Tr. 1/22/19 at 139:22-141:9 (Miropol: North Bay purchased note that was not accelerated, and Regions was charging contract-rate interest); Tr. 2/22/19 at 17:24-18:4 (Cummings: maturity date of Senior Loan had not been accelerated at time of North Bay purchase).
65. Pursuant to its decision to reject a purchase, and despite knowing the Senior Loan was for sale, GFB did not offer or demand to buy the Senior Loan on any terms. Tr. 2/1/19 at 89:2-9 (Ghomeshi did not think GFB had ever attempted to purchase the Senior Loan, either for a discount or par).
66. Moreover, although Lexi urged GFB to purchase the Senior Loan, Lexi never asked GFB to finance the purchase at par, the terms it had the right to demand under the Letter Agreement. Tr. 1/25/19 at 167:6-10 (Scott).
67. Regions was entitled to sell the Senior Loan without prior notice to or consent of Greenwald Parents or GFB. ICA, NBV Ex. A, at ¶ 22 (Regions "shall endeavor (but not be obligated) to notify Junior Secured Party of any such assignment ... within a reasonable time period after the occurrence of the assignment ..."). Although NBV claims that, had Regions provided notice, GFB would have cured, the evidence proves otherwise. GFB knew of Lexi's default since October 16, 2008 and simply monitored the ongoing Regions-Lexi workout discussions, concluding there was no need or desire to cure; and by the time of the sale to North Bay, GFB had rejected Scott's numerous requests to buy the Senior Loan.
68. On January 30, 2009, Scott again emailed Ghomeshi about a "proposed acquisition" of the Senior Loan, promising to "keep GFB up to date on the progress," RB Ex. 156, because GFB's purchase would be a "great opportunity." Tr. 1/25/19 at 99:9-23 (Scott).
69. On February 6, 2009, Scott sent Ghomeshi and Buerosse the updated spreadsheet with the remaining Lexi inventory entitled "Lexi Available Units-Loan Purchase-gfb.xls," and advised:
I am meeting with the loan purchaser [North Bay] next Wednesday and hope to be able to tell him that we can take them out at a quick profit. I am also trying to ascertain what discount this *205 package was sold at. Please call to discuss.
RB Ex. 159; Tr. 1/25/19 at 122:19-123:8 (Scott).
70. Scott suggested a $ 10 million "opening bid," a discount of nearly $ 8 million on the outstanding balance. Tr. 1/25/19 at 126:21-24 (Scott).
71. Believing that RAM (North Bay's affiliate) had purchased the Senior Loan as part of a discounted package of Regions loans, Tr. 1/25/19 at 123:9-124:5 (Scott), Scott inquired of GFB as to whether it had any interest in financing the purchase of the Senior Loan, but Buerosse believed this was premature. Tr. 2/11/19 at 93:23-94:25 (Buerosse).
72. Nonetheless, on February 9, 2009, Buerosse prepared a draft term sheet to finance Allen's purchase of the Senior Loan, which would then be collaterally assigned to give GFB a first mortgage position on The Lexi. RB Ex. 160; Tr. 2/11/19 at 95:1-10; 97:7-24 (Buerosse). Buerosse inserted "XXX" for the loan amount awaiting the results of Scott's meeting with North Bay. GFB, however, never made this advance.
73. On February 13, 2009, following the meeting, Scott emailed Cummings and two other North Bay representatives: "I believe the simplest option would be for us to purchase the loan from you at a reasonable profit as we had discussed." RB Ex. 161. Cummings understood the reference to "us" meant Allen and Scott or their entities. Tr. 2/22/19 at 34:25-35:13.
74. On February 26, 2009, Scott suggested a $ 10 million range, to which Cummings responded that this did not "make[ ] sense for us" although he would consider "a relatively quick resale of the note." RB Ex. 163. Scott's suggested price was millions less than North Bay's purchase price. NBV Ex. NN at 2. Although North Bay would have accepted a payoff at par or a discount, it was "not interested in accepting a discounted payoff that's less than what we bought the note for." Tr. 2/22/19 at 38:20-39:11; 39:25-40:12 (Cummings). Scott, however, never offered more than $ 10 million. Tr. 1/24/19 at 59:8-10 (Pacanins).
75. On March 6, 2009, Scott asked Ghomeshi to commit to a higher bid:
I am going to meet again with RAM to try to purchase the note. We need to be able to say what we would be able to purchase the note for, as they may have paid more than we thought. Let's try to come up with our top number for this. I have attached the available unit list and cash flow analysis for you and Marcus to review.
RB Ex. 168. There was no evidence that a higher bid was ever made.
76. GFB's March 31, 2009 CAR noted that North Bay had acquired the Senior Loan, and GFB was awaiting North Bay's negotiations with Lexi. RB Ex. 68.
77. GFB never made the protective advance under the GFB-Lexi Loan or otherwise to enable Allen to purchase the Senior Loan.
H. Senior Loan Matured on April 5, 2009
78. Lexi failed to pay the Senior Loan at maturity on April 5, 2009, permitting North Bay to charge default rate interest. NBV Ex. C at § 2.5(b); NBV Ex. P at ¶ 3 (a)(iii); see also Tr. 2/1/19 at 106:20-14 (Ghomeshi). Regions did not accelerate the Senior Loan; it simply matured. See Tr. 1/22/19 at 137:5-8 (Miropol: Regions never accelerated before selling Senior Loan); Tr. 1/24/19 at 62:4-8 (Pacanins: Senior Loan matured on April 5, 2009; Lexi failed to pay). Maturity and the "Great Recession", not Regions' failure to send letters *206 to GFB, were the reasons for Lexi's continued "financial distress," causing North Bay's foreclosure two months after maturity and Lexi's bankruptcy a year later.
79. On April 7, 2009, two days after maturity, North Bay sent notice advising Lexi that as a result of its default, North Bay debited the Collateral Account for default interest since December 6, 2008.[10] RB Ex. 170.[11] Although North Bay did not send a copy of the letter, GFB knew of the maturity default. RB Ex. 173 (North Bay's letter referencing Lexi's default provided to Ghomeshi on April 16, 2009); Tr. 2/1/19 at 106:1-8 (Ghomeshi knew that under 2008 Modification, Senior Loan was to mature on April 5, 2009).
I. GFB Refuses to Finance North Bay-Lexi Restructure Deal
80. After North Bay acquired the Senior Loan, respective counsel to North Bay and Lexi had "many, many, many, many conversations" to restructure the Senior Loan. Tr. 3/15/19 at 65:8-13 (North Bay's counsel, Raymond Miller ("Miller"),); see also Tr. 2/22/19 at 138:23-139:2 (Cummings: North Bay spent "roughly six" months negotiating with Lexi between its purchase of the Senior Loan and eventual foreclosure filing).
81. On April 15, 2009, North Bay offered to restructure by recalculating default interest to contract-rate and providing a three-year maturity extension with contract-rate interest and periodic principal paydowns. RB Ex. 173 at 4-5; Tr. 1/24/19 at 68:2-25; 69:5-22 (Pacanins: notwithstanding maturity, North Bay was willing to forego default interest and give a three-year extension). Lexi's counsel advised Scott he needed to be confident he could make the payments. RB Ex. 173 at 1.
82. Scott therefore needed GFB's financing commitment to proceed. On April 13, 2009, he sent Buerosse another Lexi cash flow analysis for the proposed restructure. RB Ex. 171. On April 16, 2009, Lexi forwarded to GFB the April 15th letter from North Bay, which indicated Lexi's default. RB Ex. 173.
83. Lexi and North Bay exchanged several letters negotiating the restructure, and Lexi updated GFB. See, e.g., RB Ex. 174 at 2; RB Ex. 177 at 3.
84. On April 22, 2009, Scott's assistant forwarded Lexi's financial information so GFB could consider financing the proposed quarterly principal payments. In turn, Duarte prepared a credit analysis, which Buerosse forwarded to Ghomeshi on April 25, 2009. RB Ex. 175. Buerosse also forwarded a redline draft of an updated CAR, noting that GFB was considering both the proposed restructure, which would enable Lexi to pay the Senior Loan and the GFB-Lexi Loan, and obtaining additional Greenwald collateral for the GFB-Lexi Loan. RB Ex. 176 at 7.
85. On May 4, 2009, Scott forwarded to Buerosse the "latest correspondence," a May 1, 2009 letter from North Bay's counsel, which Scott termed "basically the [restructure] deal," for which Scott needed *207 GFB's "acceptance of this as the mezz lender. If GFB is patient, they will be able to recover the entire principal balance of the loan." RB Ex. 177. The proposal included Lexi's request for a more back-ended paydown schedule. Id.
86. On May 6, 2009, Scott and Ghomeshi met. They reviewed the ICA and discussed litigation against Regions. See RB Ex. 182.
87. On May 7, 2009, Scott emailed Ghomeshi a copy of Regions' October 3, 2008 Letter, which Scott termed the "supposed default letter," along with a sales pitch for shared litigation strategy:
Dear Mehdi, Thank you again for reviewing the Interior Agreement during ourmeeting yesterday, I have attached a copy of the supposed default letter that was sent to me by Regions that you did not see. It is critically important to both of our rights to determine that you were not property noffied per the inter creditor agreement and subsequently not given an opportunity to take the appropriate actions under the loan documents. As discussed, Regions did not act in either of our interests. Sincerely, Scott Greenwald
RB Ex. 182. Scott's language is telling. He stressed that "it is critically important to both of our rights to determine that you were not properly notified" under the ICA and given the opportunity to take appropriate action.[12]
88. According to Scott, despite not receiving the October 3 Letter concurrently from Regions, Ghomeshi "knew of the situation"- that Lexi could not make the Curtailment Payment on October 16, 2008. However, Ghomeshi also knew that Scott was attempting to work this out with Regions because Scott kept Ghomeshi informed of the discussions. Tr. 1/28/19 at 5:11-17:20 (Scott). Scott did so to avoid the "need for [Ghomeshi] to have to cure -- the paydown." Id. at 17:12-14.
89. On May 7, 2009, the same day Scott suggested joint litigation against Regions to Ghomeshi, Scott and Amy accepted North Bay's further revised restructure proposal, which afforded even more favorable terms for Lexi on principal reductions. RB Ex. 393-E; Tr. 3/15/19 at 66:8-12 (Miller testifying he received countersigned term-sheet letter from Lexi, Scott and Amy); 88:15-89:15 (Scott testifying that he and Amy agreed to proposal).
90. Notably, on May 7, 2009, despite Ghomeshi's knowledge of the October 3 Letter, GFB did not demand North Bay sell the Senior Loan at par. The reason, Ghomeshi testified, was that he did not view the letter as an ICA ¶ 12 notice: "[A]s I have said, and I've continued to say, banks do use these types of letters, fortunately or unfortunately, to bring a customer to the table to negotiate ... therefore, if you have a inter-credit [sic ] agreement or an understanding with another bank, we tend not to rely on the letter that is sent to the borrower..." Tr. 2/1/19 at 120:6-25. The October 3 Letter did not accelerate the Senior Loan, so it was not relevant to GFB. Id. at 121:4-11
91. On May 15, 2009, Buerosse informed Scott that there would be no commitment to finance Lexi's agreed restructure with North Bay:
*208 Mehdi and I appreciate your interest in discussing a potential restructure of the Indigo Lofts and your desire to reach a resolution pertaining to your guarantee of the Lexi loan. Unfortunately, Great Florida Bank is unable to entertain a restructure proposal that fails to provide sufficient collateral to secure the loans and support future interest payments. Over the past several months we have exchanged many good faith proposals, in an attempt to arrive at mutually acceptable terms to restructure the loans, however, since we have been unable to reach an agreement the Bank expects you to fully comply with the exi[s]ting loan terms.
RB Ex. 184. Scott replied that this was "shortsighted." Id.
92. On May 22, 2009, Lexi sent Buerosse the formal proposed Forbearance Agreement containing the same terms as North Bay's May 7, 2009 proposal countersigned by Lexi, Scott and Amy. RB Ex. 185; Tr. 3/15/19 at 67:25-68:4 (Miller). Lexi never signed the agreement because GFB never agreed to provide financing.
93. During the restructure negotiations, Scott continually updated GFB, which prepared internal reports and analyzed Lexi's creditworthiness for potential financing of the restructured principal paydowns. NBV's contention that North Bay "exclude[d]" GFB from the restructure negotiations is without any foundation. GFB was fully informed of the ongoing negotiations at all relevant times; it simply decided the Buerosse Plan was the path GFB was taking toward repayment.
94. On June 12, 2009, the restructure negotiations having failed, North Bay sued to foreclose the mortgage on the Senior Loan. NBV Ex. DDD.[13]
J. GFB Implements Buerosse Plan
95. GFB and Allen continued to negotiate concerning additional collateral for the Greenwald loans.
96. Finally, in July 2009, consistent with the Buerosse Plan, the Greenwalds and their entities, including Lexi, agreed on a term sheet for a global restructure under which the Greenwalds would pledge additional collateral for the GFB-Lexi Loan and three other Greenwald loans, "Fellsmere," "North Bay Road" and "Indigo Lofts." RB Ex. 188. In key part, each of the Greenwalds agreed to pledge the proceeds of their limited partnership interests in the Suniland and El Mercado shopping centers for Scott's and Amy's limited guaranty of the GFB-Lexi Loan, to the extent of $ 3.275 million. The limited guaranty would supplement, not replace, Scott and Amy's Unlimited Guaranty of the Junior Loan collaterally assigned to GFB. The GFB-Lexi Loan's 2008 Amended and Restated Promissory Note for $ 8 million would be split into Notes A and B, each for $ 4 million. If Note A, the good note, were timely paid, Note B, the bad note, would be forgiven, provided that after payment to Scott of the first $ 500,000 in Lexi's "excess proceeds," GFB would still be entitled to the next 25% of those proceeds, with the other 75% going to Scott and Amy. Significantly, the Term Sheet required Scott to place $ 100,000 in a GFB deposit account to fund Lexi litigation and *209 bankruptcy-related costs in exchange for GFB's support in litigation involving the Senior Loan and Lexi's potential bankruptcy:
7. To the extent permitted by law, GFB agrees to support Lexi with regard to matters involving the [Senior Loan], including but not limited to issues arising in the context of Lexi's potential chapter 11 bankruptcy case. GFB's approval shall be subject to its review and approval the bankruptcy plan. Scott Greenwald shall place $ 100,000 into a depository account at GFB to fund Lexis litigation and bankruptcy related costs. In addition, any proceeds realized from any claims that GFB may have against the Lexi first mortgage holder shall be applied 50% first to the Lexi "A" loan and the remainder to the Lexi "B" loan.
RB Ex. 188.
K. GFB Rejects North Bay's Offer to Sell Senior Loan at Par
97. On September 9, 2009, GFB's counsel, David Freedman, advised Miller that North Bay's formal notice of Lexi's default was not required:
Perhaps we can speed up the process. GFB is of the view that it had a right to cure the default of the primary obligor and to buy the paper; that it did not get the notice which your client's predecessor was required to give to activate those rights; and that it has suffered a loss.
No need to give any formal notice at this point as the horse is out of the barn.
RB Ex. 189.
98. Miller responded with North Bay's offer to sell GFB the Senior Loan at par:
The note matured April 5, 2009. Thus, it seems that the only way to cure would be by payment in full. The Intercreditor Agreement provides your client with the right to purchase at par-principal plus accrued pre-default rate interest together with other sums due under the note-and Lexi North Bay LLC will sell the loan documents to Great Florida at that price. Please advise how your client would like to proceed.
Id. GFB declined the offer without explanation Tr. 2/11/19 at 155:20-25 (Buerosse: GFB did not accept North Bay's offer); Tr. 3/15/19 at 52:23-25; 53:20-25 (same); Tr. 2/22/19 at 50:13-25 (Cummings approved Miller's offer to sell at par; GFB never accepted or advised it was willing to purchase at par); Tr. 2/1/19 at 126:25-127:13 (Ghomeshi could not recall GFB's ever responding to North Bay's offer).
99. NBV contends that the "other sums due under the note" included default interest and therefore the offer was unacceptable. The Court finds no evidence to support such a contention. Ghomeshi understood GFB did not need to pay default-rate interest. Tr. 2/1/19 at 139:13-18. Moreover, there is no evidence that GFB declined the offer because the foreclosure had devalued The Lexi, as NBV speculates. NBV Closing Argument at 11-12.
L. GFB Declines Purchase Option at Bankruptcy
100. On June 23, 2010, Lexi filed Chapter 11. NBV Ex. JJJ. GFB knew of the filing, triggering its right under ICA ¶ 12 to purchase the Senior Loan at par by giving written notice to North Bay within 10 days ("Bankruptcy Trigger"). See NBV Ex. A at 6 ¶ 12 ("In the event [GFB] receives notice ... (b) of a Bankruptcy Proceeding with respect to [Lexi], then [GFB] shall have the option to purchase the Senior Security Documents for a purchase price equal to the outstanding amount of the Loan and all sums secured by the Senior Security Documents which would be due and payable if the Senior Debt was paid at the date of such acquisition.");
*210 Tr. 2/11/19 at 166:15-20 (Buerosse: GFB received notice of Lexi's bankruptcy filing). GFB did not give any such notice. Id. at 166:21-167:1 (Buerosse).
101. At trial, NBV argued that the Bankruptcy Trigger required GFB to pay default interest or other substantial sums, making the option then unattractive. However, the Bankruptcy Trigger in ICA ¶ 12's second paragraph would be meaningless unless its exercise would protect the other lender from having to pay default rate interest. For this reason, and according to its plain language, the second paragraph, when read with the first paragraph, specifies that if GFB (or Greenwald Parents) exercised their cure option, either would only be required to pay all outstanding principal and contract-rate interest. The second paragraph adds "all sums secured by the Senior Security Documents." North Bay understood the quoted provision as protective advances, if any, such as taxes, insurance or condominium fees. Tr. 2/22/19 at 139:12-140:3; 140:20-131:2 (Cummings). Of course, having no interest in acquiring the Senior Loan, GFB never inquired as to those other sums.
102. NBV argues that the purchase option was not a "reasonable strategy" because the bankruptcy had furthered devalued The Lexi. NBV Closing Argument at 13-14. Given GFB's continued rejection of Lexi's repeated pleas over the preceding eighteen months, there is no supporting evidence for the proposition that the bankruptcy filing changed anything. In any event, Lexi ultimately sold all its units during bankruptcy.
103. In June 2010, GFB sued North Bay to subordinate its first mortgage position on The Lexi. ECF No. 1-1. On December 21, 2010, at Ghomeshi's request, he and Buerosse met with Cummings to discuss the dispute. Tr. 2/22/19 at 52:6-18; 58:3-6 (Cummings). GFB's ICA purchase option had long since expired. GFB did not offer to purchase the Senior Loan at par or any other amount. Id. at 53:22-56:17 (Cummings: GFB did not offer to purchase Senior Loan for par or any specific number but wanted to know what North Bay had paid Regions; meeting became antagonistic); Tr. 3/15/19 at 31:15-32:12 (Buerosse: GFB had one meeting with North Bay; was not specifically to discuss purchasing loan, but to see if mutually beneficial resolution of dispute could be reached).
M. Documenting the Buerosse Plan
104. GFB rejected North Bay's loan sale offer and the Bankruptcy Trigger, opting instead to mitigate losses by obtaining additional collateral and guaranties. See Tr. 2/11/19 at 63:23-64:19 (Buerosse's approach was to obtain additional collateral); 65:22-66:4 (Buerosse: Rather than make a takeout loan to Lexi, GFB preferred for Lexi to continue workout discussions while GFB obtained additional collateral); 71:19-72:23 (Buerosse: obtaining additional collateral was GFB's "major component"; replacing Regions was "not a primary strategy"). When Scott initially suggested a takeout loan, Buerosse responded "we're really kind of relying on you to sell the units to, you know, address the -- the Regions situation, and, you know, in that context, we want some additional collateral to, you know, improve our collateral position." Id. at 72:7-15.
105. The Buerosse Plan was documented on November 5, 2009 by the following:
• Second Amended and Restated Loan Agreement by Greenwald Parents; RB Ex. 29;
• Second Amended and Restated Promissory Notes A and B for $ 4,000,000 each (collectively "Note 3"); RB Ex. 30, 31;
• Cross-Collateralization and Cross-Default Agreement by Scott, the *211 Greenwald Parents, and others; RB Ex. 35;
• Amended and Restated Collateral Assignment of Limited Partnership Proceeds from Limited Partner, assigning all proceeds or distributions due the Greenwald Parents in El Mercado Associates, Ltd ("El Mercado") ("Greenwald Parents El Mercado Assignment"); RB Ex. 36;
• Collateral Assignment of Limited Partnership Proceeds from Limited Partner, assigning all proceeds or distributions due the Greenwald Parents as limited partners in Suniland Associates, Ltd. ("Suniland") ("Greenwald Parents Suniland Assignment"); RB Ex. 33;
• Collateral Assignment of Limited Partnership Proceeds from Limited Partner, assigning all proceeds or distributions due Scott and Amy as limited partners in Suniland ("Scott and Amy Suniland Assignment"); RB Ex. 34;
• Scott and Amy's Limited Guaranty of Payment and Performance of GFB-Lexi Loan ("Limited Guaranty"); RB Ex. 32; and
• Scott's and Amy's Ratification of Continuing Guaranty, RB Ex. 28, which ratified and confirmed the Unlimited Guaranty of the Junior Loan collaterally assigned to GFB. RB Ex. 9.
106. The Court rejects NBV's contention that the Limited Guaranty of the GFB-Lexi Loan replaced and discharged the Unlimited Guaranty of the Junior Loan. The contention is belied by the Ratification of Continuing Guaranty signed on the same day and FCB's later assignment of the Unlimited Guaranty, its ratification, and the Limited Guaranty to NBV. NBV Ex. RRR at 3 (FCB assigned entire "right, title and interest in and to [documents listed on Exhibit A]") and 15 § II(3) (listing Unlimited Guaranty and 2008 and 2009 ratifications as assigned). This disproves NBV's argument that, because of Regions' breach, the GFB-Lexi Loan cannot be collected.[14]
107. On February 1, 2011, GFB and Greenwald Parents modified Note 3 with the Third Amended and Restated Notes A and B (collectively, "Note 4") and Amendment to Loan Agreement amending the Second Amended and Restated Loan Agreement. RB Ex. 38, 39, 40, 41, 42.
108. On June 30, 2012, GFB and Greenwald Parents modified Note 4 with the Fourth Amended and Restated Promissory Notes A and B (collectively, "Note 5"), RB Ex. 43, 44, 45, and Scott and Amy ratified their Limited Guaranty and collateral assignments of limited partnership proceeds from Suniland and El Mercado. RB Ex. 46, 47, 48.
109. On January 28, 2014, Scott, Amy, Greenwald Parents, and affiliates, Indigo Lofts Development Company, LLC ("Indigo Lofts"), North Bay Road, LLC ("North Bay Road"), and El Mercado, and FCB entered into a Settlement as to Ongoing Obligations and Mutual Release ("2014 Settlement Agreement"), by which FCB released and satisfied obligations of Indigo Lofts, North Bay Road and El Mercado, and the parties ratified all obligations and loan documents under and collateral for Note 5 including "all collateral guaranties." RB Ex. 55. In addition:
*212 • Scott as Assignor, Greenwald Parents as Borrower, and Billy's Creek Preserve, LLC delivered an Assignment of Cash Collateral, assigning to GFB a $ 100,000 cash collateral account as security for the obligations under Note 5; RB Ex. 49;
• Greenwald Parents delivered a Ratification of Collateral Assignment of Proceeds from Partners, ratifying their pledge of partnership interest in Suniland; RB Ex. 53;
• Amy and Scott delivered a Ratification of Continuing Guaranty, ratifying the Limited Guaranty of Note 5; RB Ex. 54; and
• Billy's Creek Mortgage delivered a Florida Real Estate Mortgage, Assignment of Leases and Rents and Security Agreement on Lee County property in favor of GFB for $ 400,000. RB Ex. 51.
110. Note 5 matured on June 30, 2014 without payment. FCB took no collection action until some 16 months later, on October 23, 2015, when its counsel, Paul Friedman (who now represents NBV), demanded turnover and an accounting from Suniland of all proceeds due and paid to Scott and Amy since November 5, 2009. RB Ex. 205; Tr. 1/29/19 at 85:3-6 (Luis Moran, FCB's corporate representative). However, FCB's collection efforts ended shortly thereafter when it assigned the Greenwald family debt and this litigation claim to NBV. Id. at 87:7-17; 88:9-21 (Moran); NBV Ex. QQQ.
N. Allen Acquires Family Debt Through NBV
111. Scott and Allen concealed Allen's involvement with NBV from FCB to provide "better bargaining ability in its purchase of the [GFB-Lexi Loan]." Tr. 1/28/19 at 64:1-6 (Scott); 64:13-18 (Scott: he and Allen "did not want [their involvement with NBV] disclosed for negotiating purposes.").
112. Allen engaged Fort Lauderdale attorney Eric Salpeter ("Salpeter") to accomplish the transaction. Tr. 1/28/19 at 58:15-22 (Scott: Allen contacted Salpeter); Tr. 1/30/19 at 33:2-5 (Allen: he contacted Salpeter about forming NBV); Tr. 2/22/19 at 142:20-23 (Salpeter: Allen retained him to form NBV and NBV Member). On September 17, 2015, Salpeter formed NBV in Delaware, RB Ex. 348 at 4, where the law permits anonymous LLCs-Delaware does not require LLC ownership disclosure. See https://www.l4sb.com/blog/regular-llc-versus-anonymous-llc/ (last visited Apr. 19, 2019).
113. Allen admitted he was NBV's undisclosed member and manager since its inception. Tr. 1/30/19 at 8:15.
114. Allen's identity was further concealed when, on November 17, 2015, Salpeter sent a "Final Offer" to buy the GFB-Lexi Loan and related documents and litigation claims, signing same as NBV's "Authorized Agent". NBV Ex. QQQ. Salpeter was only involved "[v]ery tangentially" and had "little to nothing" to do with FCB negotiations, and "was pretty much told what the terms would be." RB Ex. 363 at 13. Salpeter never disclosed Allen's connection because "[n]obody ever asked me." Id. at 156:24-157:2.
115. On December 17, 2015, Salpeter formed NBV Member in Florida, RB Ex. 348 at 35, 37-38 (reflecting initial filing date of December 17, 2015), so he could continue Allen's concealment and represent that NBV Member was the sole member of NBV. The acquisition closed that day. NBV Ex. RRR. FCB accepted $ 4 million, the Note A principal, payable $ 3,250,000 in cash, release of a $ 500,000 deposit, and NBV's $ 250,000 note. Id. ; Tr. 1/29/19 at 84:6-85:2 (Moran). FCB and *213 NBV signed an Assignment and Assumption of Loan, Loan Documents and Claims ("2015 Assignment") assigning to NBV, inter alia , the following ("FCB Assigned Rights"):
• The rights under Note 5, including collaterally-assigned Junior Loan documents;
• Amy's and Scott's Limited Guaranty of GFB-Lexi Loan;
• Amy's and Scott's Ratification of Unlimited Guaranty of Junior Loan, collaterally assigned to GFB;
• Collateral Assignment of Greenwald Parents' interest in Suniland;
• Collateral Assignment of Scott's and Amy's interest in Suniland;
• Collateral Assignment of Scott's and Amy's interest in El Mercado;
• December 31, 2013 Assignment of Cash Collateral; and
• Billy's Creek Mortgage.
NBV Ex. RRR. Scott and Amy signed as guarantors, and Greenwald Parents signed as borrowers. Id. at 7-10.
116. Although Allen actually owned and controlled NBV from inception, Tr. 1/30/19 at 9:9-11; 10:8-15 (Allen), Salpeter represented to FCB that NBV Member was NBV's sole member and manager, and he was sole member and manager of NBV Member. RB Ex. 348; Tr. 2/22/19 at 163:3-164:3 (Salpeter).[15] A public record search would not have revealed Allen's ownership and control of NBV. Tr. 1/28/19 at 63:17-20 (Scott). FCB did not know Allen controlled NBV. Tr. 1/29/19 at 69:17-22 (Moran).
117. On December 29, 2015, FCB moved to substitute NBV as party of record in Lexi's bankruptcy case and the adversary proceeding with North Bay. RB Ex. 363 at 93-115. The motion attached a Stipulation signed by Salpeter as "sole Manager" of NBV and again did not disclose Allen's involvement. Id. at 96-97.
118. On January 6, 2016, Salpeter and Allen signed articles of amendment to NBV Member's Florida filing, replacing Allen for Salpeter as member and manager of NBV Member. RB Ex. 348 at 43-46. However, Salpeter waited until January 19, 2019 to submit the amendment, after the Court granted the motion for substitution at a hearing on January 14, 2016, reflected by order entered January 19, 2016. ECF No. 506-3 ; 506-4;[16] RB Ex. 348 at 43-46. There appears to be a bad smell here.
O. The Suniland and El Mercado Proceeds Were Sufficient to Repay GFB
119. In July 2015, the Publix-anchored shopping center owned by El Mercado sold for approximately $ 23 million. RB Ex. 214; Tr. 1/28/19 at 68:13-23 (Scott).
120. Pursuant to the Scott and Amy El Mercado Assignment, all sale and other distributions due Scott and Amy were pledged as collateral for their Limited Guaranty. Those proceeds should have gone to FCB to reduce the GFB-Lexi Loan. Although Scott received a $ 319,382 distribution, he kept the funds instead of reducing the loan balance because FCB released them to Scott. Tr. 1/28/19 at 69:4-70:1 (Scott). Additionally, Greenwald Parents received a $ 3.5 million distribution. Id. at 70:2-5. Those funds were also pledged as collateral for the Limited Guarantee, *214 but were not applied to the GFB-Lexi Loan balance.
121. In or about July 2016, while NBV was holding the GFB-Lexi Loan, Suniland sold its shopping center for $ 56,000,000. Tr. 1/28/19 at 72:3-5 (Scott); RB Ex. 211 (summarizing Suniland periodic distributions to Greenwald family); RB Ex. 212 (showing sale distributions to Greenwald family).
122. Pursuant to the Greenwald family's Collateral Assignments, all Suniland distributions should have been applied to reduce the GFB-Lexi Loan. Greenwald Parents received $ 1,652,837.99, Jill separately received $ 606,040.59, and Scott and Amy received $ 2,203,783.98. RB Ex. 212; Tr. 1/28/19 at 73:9-14; 74:14-17; 75:4-8; 75:21-76:1 (Scott: all distributions except for general partnership interest pledged as collateral for Scott and Amy's Limited Guaranty).
123. Additionally, Scott received over $ 7.2 million from his general partnership interest in Suniland. Tr. 1/28/19 at 75:17-20 (Scott). Although he did not pledge this interest, the funds were available to satisfy Scoot's obligation under his Unlimited Guaranty of the Lexi Loan collaterally assigned to GFB as security for the GFB-Lexi Loan and held by NBV. RB Ex. 9, 14, 22, 28. In all, the Greenwalds received about $ 16.5 million, more than enough to pay the GFB-Lexi Loan:
Date of Amount RB Recipient Partnership Dist. Received Pledged Ex. # Allen-Jill Suniland 6-7-16 1,652,837.99 Yes RB Ex. 211 Jill El Mercado 7-5-15 835,800 No RB Ex. 214 Allen-Jill El Mercado 7-5-15 3,500,000 No RB Ex. 214 Jill Suniland 6-7-16 606,040.59 Yes RB Ex. 211 Scott-Amy Suniland 6-7-16 2,203,783.98 Yes RB Ex. 211 Scott El Mercado 7-15-15 319,382 Yes RB Ex. 214 Scott Suniland GP 7-15-15 7,377,698.03 No RB Ex. 214 Total 16,494,742.59 Pledged Total 4,782,044.56 Yes
See also Tr. 1/28/19 at 73:9-14; 74:10-17; 75:4-8; 75:9-76:1 (Scott).
124. NBV failed to demand or compel payment from the Greenwalds or to foreclose or otherwise resort to its collateral rights. Tr. 1/30/19 at 37:17-39:4 (Allen). Allen testified that although all of these rights and remedies were available, he decided, in his discretion, not to collect from himself or his family and will recover from Regions or not at all. Tr. 3/15/19 at 57:17-58:10; ECF No. 554-1 ; Allen Dep. at 367:6-368:4.
125. On April 21, 2016, Lexi, NBV and North Bay settled their adversary proceeding, pursuant to which Lexi agreed to pay North Bay $ 3.5 million, with $ 1 million paid initially and the $ 2.5 million balance in three years. On May 3, 2016, Lexi sought approval of the settlement, ECF No. 305, which was granted on June 2, 2016. ECF No. 318. On May 15, 2017, Lexi filed an Emergency Motion for Authority to Obtain Postpetition Financing, seeking approval of a $ 3.6 million DIP loan from NBV to pay off North Bay and other expenses. ECF No. 525-3. According to the motion, Lexi and North Bay agreed to a $ 250,000 discount on the settlement if paid early. Id. at ¶ 7. The Court approved NBV's DIP loan on May 26, 2017, ECF No. 525-4, which was used to pay $ 2.25 million to North Bay and $ 185,76216 as partial payment to Lexi's condominium association. ECF No. 525-5. Thus, in addition to the $ 4 million Allen, through NBV, provided to FCB to acquire the GFB-Lexi *215 Loan and this claim, Allen provided another $ 3.6 million through NBV to prepay the North Bay-Lexi settlement.
126. In June 2018, Lexi and NBV entered into a settlement with Regions' co-lenders, Popular Bank f/k/a Banco Popular North America, Armed Forces Bank, N.A. as successor to Bank Midwest, N.A., and Fifth Third Bank, N.A. as successor to First Charter Bank (collectively, the "Settling Co-Lenders"), under which the Settling Co-Lenders agreed to pay $ 825,000 to NBV to settle Count I of this action as to them. On July 13, 2018, the Court approved the settlement. ECF Nos. 477-2; 477-3; 530.
CONCLUSIONS OF LAW
A. Jurisdiction
The Court previously determined this claim is a core claim under 11 U.S.C. § 157(b)(1).
B. No Proximate Cause or Damages
To recover damages for breach of contract, NBV must prove damages proximately caused by the breach. Vega v. T-Mobile USA, Inc. , 564 F.3d 1256, 1272 (11th Cir. 2009) (citing Friedman v. N.Y. Life Ins. Co. , 985 So. 2d 56, 58 (Fla. 4th DCA 2008) ); Crowley Am. Transp., Inc. v. Richard Sewing Mach. Co. , 172 F.3d 781, 784 (11th Cir. 1999) ("A party cannot recover damages for breach of contract unless it can prove that the damages were proximately caused by the breach." (citations omitted)). Damages must either arise naturally from the breach or be contemplated by the parties at the time of the contract. Pinnacle Port Cmty. Ass'n v. Orenstein, 952 F.2d 375, 379 (11th Cir.1992) ; Air Caledonie Intern. v. AAR Parts Trading, Inc. , 315 F. Supp. 2d 1319, 1337 (S.D. Fla. 2004). Recoverable damages are limited to those which "could have been reasonably expected to flow from the breach." Bland v. Freightliner LLC, 206 F.Supp.2d 1202, 1211 (M.D. Fla. 2002) (quoting T.D.S., Inc. v. Shelby Mut. Ins. Co., 760 F.2d 1520, 1532 n. 11 (11th Cir.1985) ).
The purpose of contract damages is to place the non-breaching party in the same position it would have been in but for the breach. Allapattah Servs., Inc. v. Exxon Corp., 61 F.Supp.2d 1326, 1328 (S.D. Fla. 1999). "Contract law is designed to protect the expectations of the contracting parties." MCA Television Ltd. v. Pub. Interest Corp. , 171 F.3d 1265, 1271 (11th Cir. 1999) (citations omitted).
In this case, NBV did not at all prove that Regions' failure to provide concurrent copies of default notices was the proximate cause of loss to GFB. First, GFB had actual knowledge of Lexi's default and its ongoing workout discussions with Regions and could have made a protective advance or purchased or taken out the Senior Loan at any time. Ghomeshi admitted that GFB did not need anything from Regions to do so. Tr. 2/1/19 at 83:9-84:8. Scott advised GFB that Lexi was "working it out" with Regions, warranting GFB's conclusion that it did not need to pay $ 2.3 million for the Curtailment Payment or purchase the Senior Loan, which had not been accelerated at any time before maturity. Second, the testimony on behalf of GFB was that the default letters would not have spurred it to act because Regions never accelerated. As Ghomeshi testified, he "couldn't and did not need to worry about it, until such time Regions decides the loan is in default and accelerates." Tr. 2/1/19 at 40:19-23. Third, the Senior Loan was never accelerated; rather, the Senior Loan matured and when North Bay and Lexi did not finalize the restructure, North Bay filed a foreclosure action.
*216 Even if GFB had exercised its cure right pre-maturity, the Senior Loan would have still matured on the extended date of April 5, 2009, and Lexi would still have been unable to pay the balance. With or without the concurrent copies of the default letters, GFB would have been in the same position-actually in a worse position as it would have paid $ 2.3 million more for the Curtailment Payment-when the loan matured a few months later, with Lexi unable to cure the default upon maturity. Under these circumstances, the breach did not proximately cause any loss. See Crowley Am. Transp., Inc. v. Richard Sewing Mach. Co. , 172 F.3d 781, 784-85 (11th Cir. 1999) ; PNC Bank v. Branch Banking & Tr. Co. , 704 F. Supp. 2d 1229, 1240-41 (M.D. Fla. 2010), aff'd , 412 F. Appx. 246 (11th Cir. 2011) ; see also PNC Bank, Nat. Ass'n v. Colonial Bank, N.A. , 451 F. Appx. 835, 837 (11th Cir. 2012).
There is no causal nexus between Regions' failure to send the default letters and GFB's alleged inability to collect the GFB-Lexi Loan. GFB was "closely monitoring" the Senior Loan and had actual knowledge of Lexi's default at all relevant times. GFB also believed that Regions and Lexi were "working it out," forestalling acceleration and foreclosure. GFB had both the information and opportunity to cure or purchase; there were no impediments. Lexi even implored GFB to make the purchase, but GFB declined, instead implementing the Buerosse Plan to obtain additional collateral from the Greenwalds.
NBV presented no evidence that GFB could not have cured Lexi's monetary default or purchased the Senior Loan, had it chosen to do so. To the contrary, Ghomeshi admitted that GFB did not need Regions' notices to obtain the first lien because he could have made a takeout loan at any time without Regions' permission. Tr. 1/23/19 at 149:19-150:15. And he did not need the notice letter or Regions' permission to make an incremental loan to cure Lexi's monetary default and would have obtained a mortgage lien on the units where release prices equaled the amount of GFB's protective advance. Id. at 27:25-28:20. Indeed, GFB did not need the default letters until Regions accelerated, Tr. 2/1/19 at 40:19-23; 61:16-21 (Ghomeshi), which never occurred.
The GFB-Lexi Loan did not become "uncollectible" because Regions did not send the default letters to GFB. GFB was relying on the excess proceeds of Lexi unit sales to fund repayment of the GFB-Lexi Loan, but Lexi was unable to make those sales [to fund repayment of the loan] due to the Great Recession. GFB rejected all opportunities to provide financing to Lexi, which would have prevented foreclosure. Instead, Lexi's inability to sell units led to its default upon maturity, and the subsequent foreclosure and bankruptcy filing. There is, therefore, a complete absence of proof of causation of damages for the breach of contract.
Additionally, bankruptcy did not harm Lexi; it was able to sell units over time, as the retail market stabilized and improved. See RB Ex. 85. NBV failed to establish it suffered any amount of damages. In its Closing Argument, NBV claims Lexi's losses, but Lexi's losses are not recoverable by NBV.
The GFB-Lexi Loan was collectible if GFB and FCB continued with the restructured loan terms and required the Greenwalds to pay their obligations. So too, the GFB-Lexi Loan is fully collectible today if Allen, acting on behalf of NBV, wanted to collect on it rather than protect himself and his family.
C. Damages Claim Precluded by Doctrine of Avoidable Consequences
A plaintiff may not recover on a contract claim if it fails to use reasonable *217 efforts to avoid a loss. See, e.g., Moses v. Autuono , 56 Fla. 499, 47 So. 925, 927 (1908) ("If the plaintiff by reasonable exertions or care could have prevented damages resulting to him by reason of the defendant's breach of the contract, it was his duty to do so, and so far as he could have prevented losses to himself he cannot recover damages therefor."); Sys. Components Corp. v. Florida Dep't of Transp. , 14 So. 3d 967, 982 (Fla. 2009) (doctrine of avoidable consequences applies to contract claim). The ICA and Letter Agreement gave GFB the options to cure or purchase within ten days of receiving written notice of Lexi's default first copied to the Greenwald Parents. NBV argued that GFB could not cure or purchase unless it received the formal notice. However, the testimony and documents prove that is not so.[17] GFB knew all along about Lexi's default on the Senior Loan and the ongoing negotiations, including Lexi's inability to sell condo units during this real estate collapse, and it could have made loans to Lexi to either cure or purchase the Senior Loan at any time. All that was needed was for GFB to decide either option made financial sense to avoid further loss. GFB repeatedly and resoundingly concluded otherwise. It continuously rejected Scott's spreadsheet-backed sales pitches for GFB to buy or finance the Senior Loan rather than extract collateral from the Greenwalds. As for a cure, Ghomeshi testified that there was no reason to even consider it until the Senior Loan was accelerated, which never occurred.
GFB could have purchased the Senior Loan at par in September 2009 when North Bay offered to sell it, but it declined. Lexi's bankruptcy in June 2010 triggered the option again, which GFB again declined. These are the very contract rights of which NBV claims GFB was deprived. But GFB deliberately chose a different path, the Buerosse Plan, to recover on the GFB-Lexi Loan. GFB had the means to exercise its contractual rights and intentionally chose not to do so.
There is no evidence that the exercise of the cure or purchase right would have made any difference in collecting the GFB-Lexi Loan. But if so, GFB and its successors FCB and NBV were still obligated to cure the default or acquire the first mortgage position. These were the formal contract rights that NBV insisted GFB would have exercised if it had only received a notice letter. However, there was no evidence presented that proved GFB was ever deprived of any of these rights as a result of not receiving the notice under the ICA. Although it was fully informed of Lexi's default and the potential imminence of acceleration and foreclosure, NBV failed to take any mitigating measures, either by curing the default or by purchasing the first mortgage position, and can therefore make no claim for damages based on the failure to "trigger" those same options by formal notice. Air Caledonie Int'l v. AAR Parts Trading, Inc. , 315 F. Supp. 2d 1319, 1337-38, 1342 (S.D. Fla. 2004) (doctrine of avoidable consequences precluded contract claim; "such self-incurred damages [under lease] are not recoverable under the doctrine of avoidable consequences.") (citations omitted); Winter v. Am. Auto. Ass'n , 149 So. 2d 386, 387 (Fla. 3d DCA 1963) ("In an action on a contract, if a plaintiff [by reasonable exertion of care] can prevent damages resulting to him by reason of the defendant's wrongful acts, it is his *218 duty to do so and, so far as he can thus prevent them, he cannot recover therefor.") (bracketed text in original); Tampa Pipeline Transport Co. v. Chase Manhattan Serv. Corp. , 928 F. Supp. 1568 (M.D. Fla. 1995) (doctrine precluded recovery on contract claim because plaintiffs did not take reasonable steps to avoid claimed losses); Banks v. Salina , 413 So. 2d 851, 852-53 (Fla. 4th DCA 1982) (buyer's self-incurred delay in repairing roof leaks caused by their unreasonable demand that roofing companies "guarantee" their work triggered doctrine of avoidable consequences, as buyers had duty to mitigate damages and carry out roof repairs themselves); accord Messer v. E.F. Hutton & Co. , 833 F.2d 909, 921 (11th Cir. 1987) (doctrine precluded recovery for plaintiff's failure to mitigate alleged loss against brokerage firm).
GFB, FCB and NBV also could have mitigated any perceived damages by requiring the Greenwalds to satisfy the GFB-Lexi Loan. The Greenwalds collected more than twice the principal of the GFB-Lexi Loan from their two real estate limited partnerships without any real efforts by GFB, FCB or NBV to collect a dime. The only effort was a single letter, ironically enough from Paul Friedman, then counsel to FCB, demanding turnover of collateral proceeds and accounting from Suniland. As soon as the Greenwalds felt the pressure of this demand, Scott and Allen caused NBV to be formed, concealed Allen's connection from FCB, and acquired the Lexi debt for $ 4 million. Although Allen can certainly collect the GFB-Lexi Loan from himself and his family, he has decided to waive those rights and seek collection from Regions, or not at all. "Not at all" is the result here.
The GFB-Lexi Loan is not uncollectible; it is merely in the hands of an opportunistic obligor and guarantor who has contrived this claim. The Court concludes the equities of this case lie with Regions Bank.

"NBV" is Plaintiff NBV Loan Acquisition, LLC; "Regions" is Defendant Regions Bank; "Lexi" is Defendant Lexi Development Co., Inc.; "GFB" is Great Florida Bank, n/k/a Florida Community Bank ("FCB"); "North Bay" is Lexi North Bay, LLC; "Allen" is Allen Greenwald; "Greenwald Parents" are Allen and his late wife Jill Greenwald; "Scott" is Scott Greenwald and "Amy" is Amy Greenwald, Scott's wife. Other capitalized terms are defined herein.

NBV also sued Regions' co-lenders, which subsequently settled and were dismissed from this case. See Case No. 10-27573, ECF No. 386. As such, the Court refers generally to Regions as the Senior Lender.

To the extent the Court's Order granting partial summary judgment conflicts with these findings and conclusions, these findings and conclusions, which are based upon the evidence admitted at trial, are the findings and conclusions of the Court as to Count 1.

In its Order granting partial summary judgment (ECF No. 254 ), the Court noted that NBV's rights to cure defaults under or purchase the Senior Loan were not triggered until receipt of formal written notice from the bank. However, at trial, that proved to be inaccurate. While formal notice triggers the cure or purchase rights before acceleration and the charging of default interest , the Junior Lenders always retained the rights to cure the default or purchase the Senior Loan at par, at any time, without formal written notice.

"Substandard" means the loan involves "more than a normal risk due to the financial condition or unfavorable record of the obligator, insufficiency of security, or other factors noted in the examiner's comments. See https://www.fdic.gov/regulations/safety/manual/section3-2.pdf at 3.2-47 (last visited Apr. 18, 2019).

Allen did not recall receiving the October 3 Letter but did not deny receipt. Tr. 1/30/19 at 57:3-14.

Regions also released pledged forfeited deposits for Lexi's operational bills, id. at 1, despite Lexi's default status and Regions' unexercised right to exercise its rights and remedies. Tr. 1/25/19 at 71:8-72:23 (Scott).

The Court believes there was never a real concern about tortious interference or lender liability because GFB was not a stranger to the Regions-Lexi relationship. Ernie Haire Ford, Inc. v. Ford Motor Co. , 260 F.3d 1285, 1294 (11th Cir. 2001) (tortious interference cannot lie unless interfering party is stranger to subject business relationship).

While the Court questions the basis for North Bay's charging default interest from December 2008, rather than from the 2009 maturity date, the Court nonetheless finds the Senior Loan was not accelerated prior to maturity.

During trial, NBV's counsel referred to this letter as "accelerating" the Senior Loan. On Regions' objection, NBV's counsel admitted: "[Regions'] Counsel is right, the word 'acceleration' is not in there. I'll rephrase." Tr. 2/22/19 at 98:12-13. However, in its Closing Argument, NBV repeats the mischaracterization: "On April 7, 2009, North Bay provided [Lexi] with a notice of default declaring the Senior Loan had been accelerated ...." Closing Argument at 9.

In connection with the continuing restructuring of the GFB-Lexi Loan, GFB agreed to give Scott 50% of GFB's net proceeds of this action after specified applications to outstanding Notes. RB Ex. 40. (See, supra , J. GFB Implements Buerosse Plan .)

NBV argues that the Senior Loan was accelerated because the foreclosure complaints so allege. Cummings testified there was no acceleration and these allegations were mistaken. Tr. 2/22/19 at 106:4-107:9. The Court finds Cummings testimony credible and believes the allegations in the complaints regarding acceleration are not accurate, given the evidence presented at trial. The Court believes such allegations are the result of using a form foreclosure complaint and do not establish the facts, as proven at the trial herein.

As noted, Allen testified that he has not enforced either the Limited Guaranty or the Unlimited Guaranty or sought to collect from any of the collateral for the former in his "discretion," as he will collect from Regions or not at all. Tr. 1/30/19 at 37:17-39:7; Allen Dep. at 358:9-364:22; 367:6-368:9 (ECF No. 554 ).

Salpeter identified himself to FCB as "Trustee" for NBV and NBV Member, RB Ex. 348 at 1-2, and used the same designation in NBV's Operating Agreement dated as of December 17, 2015, id. at 13 and 19, but admitted there was no Trust. Tr. 2/22/19 at 149:16-150:3.

The Court has taken judicial notice of these filings. ECF No. 530.

While formal notice triggers the cure or purchase rights before the Senior Loan can be accelerated and default interest charged, the Junior Lenders always retained the rights to cure the default or purchase the Senior Loan at par, at any time, without formal written notice.